**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **NETHANIAL CHAIM BLUTH, et al.,** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| **v.** : | **Civil Action No. 12-250 (GK)** |
| : | |
| **ISLAMIC REPUBLIC OF IRAN,** : | |
| **et al.** : | |
| : | |
| **Defendants.** : | |

**Memorandum Opinion**

On February 13, 2012, ten members of the Bluth family ("Plaintiffs" or "the Bluths") filed a Complaint alleging that the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Iranian Revolutionary Guard Corps ("Iranian Defendants") are liable under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for Plaintiffs' physical and emotional injuries arising from a terrorist attack by Hamas directed at a classroom full of students studying Torah on March 7, 2002. Am. Compl. ¶¶ 10-19 [Dkt. No. 5]. According to the Complaint, the Iranian Defendants "provided material support or resources including cover, sanctuary, technical assistance, explosive devices, and training" to the terrorists. Id.

On February 24, 2015, the Clerk of the Court declared the Iranian Defendants to be in default because they had never

responded to the Complaint. In order to obtain a default judgment under FSIA, plaintiffs must establish their claim or right to relief by evidence that is satisfactory to the Court. See 28 U.S.C. § 1608(e). As explained herein, Plaintiffs have met this standard. Accordingly, the Court will grant their Motion for Default Judgment.

## I.   FINDINGS OF FACT

### A.   Background

#### 1.   Hamas

Hamas is a Palestinian Sunni Islamist group that formed in 1987 as a derivative of the Palestinian branch of the Egypt-based Muslim Brotherhood. Declaration of Dr. Matthew Levitt[1] ("Levitt Decl.") at 17 [Dkt. No. 56-2]. Known as Harakat al-Muqawamah al-Islamiyya in Arabic, (translated as "The Islamic Resistance Movement") ("Am. Compl.") [Dkt. No. 5 ¶ 24], Hamas aims to destroy Israel and create an Islamic Palestinian state in its place. Levitt

---

[1] At the Evidentiary Hearing, the Court found Dr. Levitt to be a qualified expert for purposes of testifying on issues relating to Hamas and Iran's support of Hamas. Tr. at 8. Dr. Levitt holds both a Masters of Law and Diplomacy (MALD) and a Ph.D. in International Relations from The Fletcher School of Law and Diplomacy at Tufts University, and has extensive experience spanning over two decades. Levitt Decl. at 1; Levitt Curriculum Vitae [Dkt. No. 56-4].

Decl. at 17; Declaration of Dr. Patrick Clawson[2] ("Clawson Decl.") at 10 [Dkt. No. 56-1].

Hamas also fights against secularization and Westernization of Arab society and aims to be recognized internationally as the only representative entity of the Palestinian people. Levitt Decl. at 17. Hamas engages in social welfare and political activity, as well as guerilla and terrorist attacks to achieve its goals. Id. Hamas emphasizes violent jihad,[3] which is a "religiously sanctioned resistance against perceived enemies of Islam." Id. at 17–18.

Within Hamas, the Izz a-Din al-Qassam Brigades form the military wing that carries out acts of violence against both military and civilian targets, including suicide as well as other types of bombings, use of Qassam rockets,[4] mortar fire, and shootings. Levitt Decl. at 18. In the 2003 Patterns of Global

---

[2] At the Evidentiary Hearing, the Court found Dr. Clawson to be a qualified expert for purposes of testifying on issues relating to Hamas and Iran's support of Hamas. Tr. at 8. Dr. Clawson is the Director of Research at the Washington Institute for Near East Policy and has been studying the Middle East, in particular Iran, for approximately thirty-five years. Clawson Decl. at 1; Clawson Curriculum Vitae [Dkt. No. 56-3].

[3] Jihad, as used by al-Qaeda, also means "holy war towards the establishment of the Islamic Caliphate worldwide." Clawson Decl. at 10.

[4] A Qassam rocket is a simple, cylindrical, short-range rocket with a small warhead on its tip that is deployed primarily from the Gaza Strip. A 2010 U.S. Department of Defense Report indicated that Iran helped in the development of the Qassam rocket. Levitt Decl. at 16.

Terrorism, the United States Department of State reported that Hamas carried out more than 150 attacks globally, including one of the most deadly attacks in 2003. Levitt Decl. at 15; see Pls.' Ex. 7 [Dkt. No. 58-7].

As of March 2004, Hamas had carried out 425 terrorist attacks since its creation; it had killed approximately 377 people and wounded 2,076. Levitt Decl. at 18; Pls.' Ex. 15 [Dkt. No. 58-15]. One element of the group's strategy is to terrorize and then pressure leaders to give concessions to Hamas to stop the violence. Levitt Decl. at 19. The "social" wing of Hamas indoctrinates, recruits, and supplies funding for the military wing. Am. Compl. ¶ 27.

In 1995, the United States Government designated Hamas as a "Specially Designated Terrorist" entity pursuant to the International Emergency Economic Powers Act. Am. Compl. ¶ 25 (citing 50 U.S.C.A. §§ 1701, 1702; Exec. Order No. 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995)). Only two years later, Hamas was identified and labeled as a "Foreign Terrorist Organization," pursuant to 8 U.S.C. § 1189. Am. Compl. ¶ 26. It is unlawful to provide material support and resources, including currency or monetary instruments, financial services, personnel, transportation, and other provisions to any components of a Foreign Terrorist Organization. Id.; see 18 U.S.C.A. §§ 2339A, 2339B.

Various press outlets, including the al Qassam website, which is the official English language website of Hamas' military and terrorist wing's "information office," track Hamas' acts. Levitt Decl. at 21. Confirmed Hamas attacks include high-population areas such as education centers, cafes and restaurants, command bases, and buses, all of which are bound to injure or kill large groups of people at any given time. Id. at 21-22. Hamas' pattern of activity meets the criteria for "terrorism," which is defined as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." 22 U.S.C.A. § 2656f(d)(2); see 8 U.S.C. § 1189(a)(1)(B).

### 2. Iran as a State Sponsor of Terrorism

A "state sponsor of terrorism" refers to a country whose government the United States Secretary of State has determined, for purposes of Section 6(j) of the Export Administration Act of 1979, (50 U.S.C. App. § 2405(j)), Section 620A of the Foreign Assistance Act of 1979, (22 U.S.C. § 2371), Section 40 of the Arms Export Control Act, (22 U.S.C. § 2780), or any other provision of law, "is a government that has repeatedly provided support for acts of international terrorism," 28 U.S.C.A. § 1605A(h)(6); see also "Terrorist Groups," U.S. Department of State, https://www.nctc.gov/site/groups.html. The government of the Islamic Republic of Iran ("Iran") has been identified as a state sponsor of terrorism since January 19, 1984. Moradi v. Islamic

Republic of Iran, 77 F. Supp. 3d 57, 65 fn. 7 (D.D.C. 2015) (citations omitted); see generally Levitt Decl.; Clawson Decl.

Beginning in the early 1990's, Iran and Hamas developed a close relationship. Clawson Decl. at 10. Iran was driven by its desire to disrupt the Middle East peace process in the late 1990's and relied on terrorist activities to do so, strongly and publicly encouraging such activities from Hamas. Id. The Iranian Revolutionary Guard Corps ("IRGC") and Iran's Ministry of Information and Security ("MOIS") made terrorism training available to Hamas members as well as other terrorist groups. Id. at 7. Iran has provided financial support as well as tactical training and planning support to Hamas. Id. at 8-10 (citing the Patterns of Global Terrorism annual reports by the U.S. Department of State pursuant to 22 U.S.C. § 2656f(a)). Moreover, Iran employs a performance-based approach to calculate its level of funding for a terrorist group and rewards groups like Hamas for successful attacks. Levitt Decl. at 7 (citing Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)).

In 1997, during a televised interview of Hassan Salameh, a Hamas member, it was publicly revealed that Hamas members flew to and trained in Iran and received support from Iran. Clawson Decl. at 10. In 2003, the Israeli Ministry of Foreign Affairs estimated that Iran provided Hamas with approximately $3 million per year. Id. at 11. That same year, estimates of Hamas' budget ranged

-6-

anywhere from $30 million to $90 million per year. Levitt Decl. at
13. Of that amount, according to FBI testimony, an estimated $25
million to $30 million per year came from foreign funding. Id.
Monetary funding supports the costs of propaganda, terror
activities, social welfare (including payments to the families of
suicide bombers), bribes, intelligence payments, long-term
infrastructure, and safe houses. Id. at 12-13.

The relationship between Hamas and Iran cooled after 2003,
following a vigorous Israeli campaign against Hamas. Clawson Decl.
at 11. However, Hamas and Iran re-developed their relationship in
2006 when Hamas gained power in the Palestinian elections and took
control of the Gaza strip in 2007. Id. In the years following, the
relationship between Hamas and Iran has been continuously
recognized in studies prepared by the United States Government and
other organizations. Levitt Decl. at 16-17; Clawson Decl. at 11
(citing academic scholarship, U.S. Department of Defense Report,
Institute for Peace study, Human Rights Watch Report, and
Congressional Research Service work that have traced the existing
relationship between Iran and Hamas up until 2014).

### 3.   March 7, 2002 Attack on Atzmona

On Thursday, March 7, 2002, a yeshiva[5] in Atzmona, located in
the Gaza Strip was attacked. Transcript of Evidentiary Hearing

---

[5] A yeshiva is a pre-military religious academy where students
study religion and the Israeli state. Tr. at 22-23. Most of the

("Tr.") at 10, 79 [Dkt. No. 60]. Nethaniel Chaim Bluth ("Nethaniel," "Plaintiff") was a student at the yeshiva on the night of the attack. Nethaniel was born in Jerusalem, Israel and lived in Israel for most of his life. Id. at 19-20; Pls.' Ex. 33 [Dkt. No. 59-33]. He grew up in a small religious settlement in Israel, where his mother resided until she passed away approximately one year ago and where his father continues to reside. Tr. at 18, 21. For the entirety of his life, Nethaniel has been a dual citizen of Israel and the United States, because his parents are American citizens. Id. at 20.

Following high school graduation, Nethaniel chose to attend the yeshiva in Atzmona before joining the Israeli army to complete Israel's mandatory service requirement. Id. at 21-22. Two of Nethaniel's brothers had attended the same yeshiva before him. Id. at 24, 72. By the time of the attack, Nathaniel had been studying in Atzmona for half a year. Id. at 61-62. He had recently decided to extend his original year-long stay an additional six months because he enjoyed his studies and the community. Id. at 24-25.

Nethaniel, like the other 120 students, slept, ate, and studied every day at the yeshiva. Id. at 25, 32. Despite being

---

students enroll following high school graduation and are eighteen or nineteen years old. Id. Although the curriculum also includes fitness training and prepares students to be soldiers, its purpose is educational, not military. Id. at 79-80. Students at the yeshiva do not carry weapons. Id. at 41, 80.

away from the family home, Nethaniel stayed in close contact with his parents and seven siblings. Id. at 18-19, 73. He went home frequently, as did his siblings, typically on a weekly basis. Id. at 33. The family home was approximately a two-hour drive from the yeshiva. Id. at 29. Six of the eight Bluth children, including Nethaniel, used the family home in Neve Tzuf as their permanent residence. Id. at 64, 85-86; Deposition of Isaac Menahem Bluth ("Isaac Depo.") at 6-7 [Dkt. No. 58-49].

On the night of March 7, 2002, there were approximately thirty students in Nethaniel's classroom. Tr. at 36. Students generally studied late on Thursday nights because they either went home for Sabbath on Fridays or used the day as a personal "free day." Id. at 34-35. During a lecture at approximately 11:30pm, Nethaniel and the other students heard the sounds of gunfire and grenade explosions. Plaintiffs' Proposed Findings of Fact and Conclusions of Law in Support of their Motion for Default Judgment ("Statement of Facts") at 7 [Dkt. No. 59]; Tr. at 41. The rabbi in the classroom instructed a student to turn off the lights and everyone in the classroom remained silent and waited. Tr. at 37.

Nethaniel moved towards the glass door and window to see what was causing the noise. Id. at 37-38. When Nethaniel looked out, he saw his friend Asher Marcus and a rabbi who was on duty as a guard that evening sitting in a Jeep talking. Id. Upon more explosions and shooting, students began to scream and Bluth saw Asher and the

-9-

rabbi running towards one room, and then towards Nethaniel's classroom. Id. at 39. Nethaniel described Asher as terrified and white in the face. Id. Nethaniel held the classroom door open for Asher, and as he came running through the doorway, Asher was shot and fell on Nethaniel, who caught him. Id. at 39, 43. At the same time, Nethaniel saw the attacker come out from between two other buildings, approximately thirty feet from his classroom.[6] Id. at 40-41. The attacker then started shooting into Nethaniel's classroom as he walked towards the building. Id. at 40, 42.

With Asher on top of him, Nethaniel laid on the floor with his hands on his head, unable to move. Id. at 43. Nethaniel warned his classmates that the attacker was approaching the classroom. Id. at 40. He saw that the attacker was wearing a black vest filled with ammunition and grenades. Id. at 41. A guard driving in a car tried to run over the attacker to stop him, but was unable to, because of the sand surrounding his car. Id. at 45. No one in the classroom was armed the night of the attack, id. at 41, and so each person simply waited and prayed, id. at 43.

Following the shots into Nethaniel's classroom, the attacker threw two grenades into the classroom through a window. Id. at 45. The first grenade exploded approximately three meters from Bluth's face. Am. Compl. ¶ 64. Nethaniel felt blood going down his face

---

[6] Nethaniel also indicates that the buildings were thirty meters from his classroom. Tr. at 39-40.

and heard more screaming and praying. Tr. at 46. There was a second grenade and explosion. Id. Following the second explosion, the attacker moved elsewhere and people started getting up and taking care of the wounded. Id. at 46-47. Nethaniel's friend helped stop the bleeding on Nethaniel's head because Nethaniel could feel that something had happened to his own hands. Id. at 47.

Israeli soldiers killed the attacker following a twenty-minute gun battle. Statement of Facts at 7. At about the time the attacker was killed, ambulances and soldiers arrived at the area and Nethaniel was taken outside. Id.; Tr. at 47. By the end, five people were killed and approximately twenty-three others were injured. Levitt Decl. at 20 (citing news reports and Israel Ministry of Foreign Affairs). Of the five deaths, two were Nethaniel's close friends, Asher and Eran Picard. Statement of Facts at 7. Nethaniel saw the bodies of his two dead friends, as well as other injured friends laid out on the grass when he was brought outside. Tr. at 47.

The National Consortium for the Study of Terrorism and Responses to Terrorism ("START") at the University of Maryland identified the attacker as Mohammad Farahat.[7] Levitt Decl. at 20 (citing Incident Summary, 03/07/2002, Global Terrorism Database,

---

[7] Spelled "Muhammad Parhat" in the Complaint.

National Consortium for the Study of Terrorism and Reponses to Terrorism, http://www.start.umd.edu/gtd/search/IncidentSummary.aspx?gtdid=200203070002); Pls.' Ex. 20 [Dkt. No. 58-20]. START also confirmed in its Global Terrorism Database that a Hamas representative claimed responsibility for the Atzmona attack. Id. (citing Incident Summary, 03/07/2002). Major media outlets, including BBC, The Guardian, and the al Qassam website, also reported that Hamas claimed the attack as its own. Levitt Decl. at 19, 21; Pls.' Exs. 17-18, 22 [Dkt. No. 58-17, -18, -22]. It was reported that Farahat trained for two days prior to the operation. Levitt Decl. at 21 (citing a translation of Al Sharq Al Awsat, An Interview with the Mother of a Suicide Bomber, the Middle East Media Research Institute, Special Dispatch No. 391 (June 19, 2002), http://www.memri.org/report/en/0/0/0/0/0/0/683.htm).

As the following suggests, Farahat had deep ties with Hamas. Levitt Decl. at 20. When Farahat was seven years old, a former head of the Hamas military wing took refuge from the authorities in Farahat's home for fourteen months and was ultimately killed there. Id. (citing An Interview with the Mother of a Suicide Bomber). A video of Farahat's mother posted on the al Qassam website prior to the attack captured how proud she was to sacrifice her son Farahat to Allah. Pls.' Ex. 27 [Dkt. No. 58-27].

Farahat kept in contact with his mother after he arrived in Atzmona and Hamas operatives notified her when Farahat penetrated

the settlement security fence. Levitt Decl. at 21 (citing Holy
Land 2006 Gaza Um Nadal). Following the attack, Farahat's mother
emphasized the Atzmona attack and glorified her son. See, e.g.,
Pls.' Ex. 22 [Dkt. No. 58-23]. She praised Farahat publicly as the
model martyr and even used the security fence taken from Atzmona
as a chicken-wire fence next to her home. Levitt Decl. at 21
(citing Mother of Martyrs in Parliament for Hamas, Deutsche
Presses-Agentur,          (Jan.          31,          2006),
http://www.arabnews.com/node/279724); see also Pls.' Ex. 14 [Dkt.
No. 58-14]. Visible to visitors, the wall near the fence read:
"Through this Mohammad got into the settlement." Levitt Decl. at
21 (citing Mother of Martyrs in Parliament for Hamas). In 2006,
Farahat's mother won a seat in the Palestinian Legislative Council
on the Hamas ticket. Pls.' Ex. 23 [Dkt. No. 58-23].

### 4.   Nethaniel Bluth's Injuries

After the attack, Nethaniel was identified as one of the
students who was most critically injured. Tr. at 89; Statement of
Facts at 7. He was covered in blood, had burns over much of his
body, and had injuries to his head, face, and chest. Statement of
Facts at 8. Nethaniel testified that at that time he could not
feel his hands. Tr. at 47. The doctor who bandaged Nethaniel's
forehead and hands at the scene of the attack believed that there
was a bullet entry wound in Nethaniel's sternum, right above his
heart. Id. at 48; Statement of Facts at 7. It remains unclear

whether Nethaniel was hit by a bullet or shrapnel.[8] An exit wound was not readily identified at that time, causing serious concern, because it may have been lodged in his body. Tr. at 44. Nethaniel was put on a stretcher and was one of two people transported by helicopter from Atzmona to Tel Hashomer Hospital. Id. at 49.

Upon arriving at the hospital, Nethaniel was conscious, extremely anxious, and disoriented. Statement of Facts at 9. Nethaniel testified that he was still in shock and stressed from seeing his friends dead on the grass. Tr. at 47. As he was moved through the emergency room for tests, he briefly passed by several members of his family. Id. at 51; see Am. Compl. ¶¶ 66, 68-70, 73. Following the tests, Nethaniel went into multiple surgeries for his ears, the embedded shrapnel, and bullet wound. Tr. at 52. Nethaniel suffered forehead and hand injuries from the first grenade explosion. Id. at 45; Statement of Facts at 7. Pieces of the grenade were embedded in his chest area and hand. Tr. at 45.

The right side of Nethaniel's face was severely cut from the grenade explosion and his head wound was so deep that the bone was visible. Id. He also had open wounds on his arms, forehead, and chest. Id. at 92. Many of the wounds required stitches. Id. Nethaniel needed plastic surgery for his face and head due to the

---

[8] In the Evidentiary Hearing, Nethaniel's father stated that the wound in Nethaniel's chest may have been caused by a bullet or a fragment of a bullet or a piece of shrapnel. Tr. at 90.

blast and shrapnel from the grenade. Deposition of Joseph Bluth at 14 [Dkt. No. 58-46]. In addition, the plastic surgeon had to reattach part of his scalp to his skull. Id. at 15.

Nethaniel continued to be hospitalized for several days following the operations.[9] Tr. at 52. The surgeon at Tel Hashomer Hospital concluded that, while there was an indentation in Nethaniel's chest from an object, there was no damage to his vital organs.[10] Id. at 90. The surgeon believed that the fragment - whether it was a bullet or part of a grenade - hit Nethaniel's sternum and deflected out of his body. Id.

Nethaniel's hearing was significantly impaired by the grenade explosion. Id. at 46. While one eardrum was dislodged (it eventually re-lodged), the other was completely blown out. Id. at 92. When he first took a hearing test following his surgeries, he could not hear anything, id. at 52-53, and broke down in tears when he realized that he could not hear. Id.; Statement of Facts at 9. He continues to have issues with his hearing and has complete hearing loss in one ear. Tr. at 57; Statement of Facts at 9.

Prior to the attack, Nethaniel had no medical issues, major surgeries, history of depression, anxiety, or other mental health concerns. Tr. at 32-33; Statement of Facts at 8. As a result of

---

[9] Nethaniel's father stated that Nethaniel was discharged a week and a half later. Tr. at 94.

[10] No medical records were entered into evidence.

the attack, he suffered from high levels of fear, anxiety, paranoia, and extreme emotional fluctuations. See Statement of Facts at 10-11. Nethaniel was traumatized from seeing his close friends lying bloody on the ground and cried when he later learned that they had died. Tr. at 47-48. Immediately following the attack, his speech was affected and he stuttered for a period of time. Id. at 91-92. Nethaniel was scared of noises and paranoid about people entering his room at the hospital. Statement of Facts at 10. He testified that he was afraid to be alone and needed someone near him at all times. Tr. at 53, 55-56.

Following his discharge from the hospital, Nethaniel returned to the family's home in Neve Tzuf. Id. at 94. Nethaniel continued to go back to the hospital for outpatient treatment in the audio ward for his hearing. Id. He needed someone with him for everyday activities, such as walking, urinating, and showering. Statement of Facts at 10. His father testified that Nethaniel was hesitant and extra cautious during that period. Tr. at 94. Nethaniel testified that he was afraid of the dark and, the minute the day ended and the sun went down, he would close all the curtains and windows, and lock the doors. Id. at 53. Nethaniel suffered from headaches and terrible nightmares, which started at the hospital and continued frequently in the period immediately after the attack. Id. at 57-58; Statement of Facts at 9-10. Without pills or the comfort of his parents, Nethaniel struggled to fall sleep. Tr.

at 53. The constant ringing and physical pain in Nethaniel's ears continued for weeks following the attack. Statement of Facts at 9.

After returning home from the hospital, Nethaniel spent a few days at home and then went back to visit the yeshiva. Tr. at 55. He testified that it was important for him to return as soon as he could to understand what had happened. Id. Moreover, it was rehabilitative. Id. at 96. When Nethaniel eventually returned to study at the yeshiva, he struggled with his fear of loud noises. Id. at 58. Once during a thunderstorm, the lights went out and the darkness and loud noises brought him back to the night of the attack, the moments when he waited for the attacker's bullet on the night of the attack, and he started crying. Id. While the students were moved to and slept in more protected rooms than before the attack, Nethaniel still needed someone with him at all times. Id. at 56. He even showered with the door open because he was afraid to be alone. Id. at 53.

After finishing the rest of his time at the yeshiva, Nethaniel entered the army in March 2003. Id. at 61. Upon entering, Nethaniel's placement was affected by his injuries. Id. at 61-62. Nethaniel testified that most of his injuries were still present when he joined the army and therefore, with doctors' notes, the army had to find a job that he could do despite his injuries. Id. at 61. Nethaniel served in the army for five and a half years, id. at 56, and described his time with the army as helping him gain a

-17-

sense of self-confidence in his ability to protect himself and friends. Id. Nethaniel relies on a firearm to feel safe and always carries one with him. See Statement of Facts at 10-11.

Fourteen years later, Nethaniel's injuries from Atzmona continue to affect both his personal life and career. Tr. at 57; Am. Compl. ¶ 64. His hearing is permanently impaired and he is unable to hear his wife and children or his co-workers when they call him from another room. Tr. at 57. He continues to suffer from tinnitus. Pl. Compl. ¶ 10. Nethaniel has substantial permanent scarring on his face, head, chest, and arms. Statement of Facts at 9; Tr. at 45-46. The shrapnel left in Nethaniel's hands and face continue to cause him significant pain and affect his bones, especially in cold weather or with a change in weather. Tr. at 46, 59.

Nethaniel continues to struggle with flashbacks to the night of the attack when he sees his scars and when he sees the parents of the students who were killed. Id. at 57. He continues to feel guilt and remorse for the death of his two close friends who were by his side throughout the attack. Statement of Facts at 11. He has nightmares from time to time and frequently wakes up at night to lock all the windows. Id. at 10-11; Tr. at 58. Nethaniel continues to struggle with his fear of the dark and his paranoia of loud noises or explosion-like sounds. Tr. at 53-54, 58.

Nethaniel states that he no longer has the same "ability to enjoy life in a carefree way" as he did prior to the attack and is constantly alert. Statement of Facts at 11. Even today, the Bluth family is careful about engaging in certain conversations with Nethaniel and how they act around him. Id. His father testified that Nethaniel's comedic personality and sense of self-confidence changed after the attack. Statement of Facts at 10; Tr. at 71.

### 5.   Family's Injuries

On the night of the attack, Shoshana Rosalyn Bluth ("Shoshana"), Nethaniel's mother, was at the family home with Isaac Bluth ("Isaac"), the youngest of the Bluth brothers, and Tsipora Batya Bluth ("Tsipora"), Nethaniel's only sister. Tr. at 86; Deposition of Tsipora Batya Bluth Reicher ("Tsipora Depo.") at 7 [Dkt. No. 59-47]. Shoshana, Tsipora, and Isaac learned about the attack on the yeshiva through television news. Am. Compl. ¶¶ 68-69. Ephraim Bluth ("Ephraim"), Nethaniel's father, was in New York on a business trip and learned about the attack when Shoshana called him. Tr. at 81.

Joseph Bluth ("Joseph"), Nethaniel's oldest brother, was at Tel Hashomer Hospital, awaiting the birth of his first child when Nethaniel unexpectedly arrived in critical condition. Statement of Facts at 13; Am. Compl. ¶ 73. Yigal Ami Hai Bluth ("Yigal"), Nethaniel's brother, was at a wedding in Jerusalem when he learned about the attack that night through friends and the rabbinic staff

-19-

of Nethaniel's yeshiva, who were also attending the wedding. Tr. at 86. Chanina Samuel Bluth ("Chanina"), another of Nethaniel's brothers, was in the army and was told that Nethaniel was injured and transported to Tel Hashomer Hospital. Am. Compl. ¶ 72. Abraham Bluth ("Abraham"), another of Nethaniel's brothers, was also in the army when he received a call from his wife about Nethaniel. Id. ¶ 74. Lastly, Arieh Yehuda Bluth ("Arieh"), another brother, was traveling in Poland on the night of the attack when he learned that Nethaniel was injured. Id. ¶ 71.

When Shoshana, Isaac, and Tsipora saw the reports of the attack on their television, Shoshana and Tsipora tried to call Nethaniel and his friends at the yeshiva to check whether they were safe. Id. ¶ 68. The initial reports of the attack were not very informative and the uncertainty of the whereabouts of Nethaniel terrified his mother. Tr. at 82. Anxious for Nethaniel, Shoshana called Ephraim after hearing the reports of the attack, although she knew very few details at the time. Id. at 82-83. The other Bluth family members heard about the attack almost at the same time. Id. at 86. Despite continued efforts, the Bluth family was unable to reach Nethaniel. Statement of Facts at 12.

Approximately an hour passed between learning of the attack and the family learning from one of Nethaniel's friends, who

-20-

answered Nethaniel's cellphone, that Nethaniel was injured.[11] Id.; Am. Compl. ¶¶ 66, 68. Twenty minutes after her first call, Shoshana called Ephraim again to let him know that Nethaniel was injured and was being moved to a hospital. Tr. at 84-85. However, there were no details about the extent of Nethaniel's injuries or to which hospital he was being moved. Id.

Yigal left the wedding and picked up Shoshana, Tsipora, and Isaac at the family home to find Nethaniel. Am. Compl. ¶ 70. Without knowing which hospital Nethaniel was being taken to, they began driving towards the center of Israel where the major hospitals were located and they did not want to waste any time. Tr. at 85; Statement of Facts at 12. Another half an hour had passed before they learned that Nethaniel was taken to Tel Hashomer Hospital. Tr. at 88. As soon as Shoshana heard this, she knew that Nethaniel was one of the critically injured students because she had heard on the radio that the most injured students were taken to Tel Hashomer Hospital. Id. at 89; Isaac Depo. at 11.

The car ride to the hospital was "very quiet" and the family members feared the worst. Statement of Facts at 13. Joseph, who was already at Tel Hashomer Hospital and also watched the televised reports of the attack, believed that the severely injured person

---

[11] It is unclear whether Shoshana received a call from Nethaniel's friend or another person. Ephraim testified that a father of another student at the yeshiva called Shoshana. Tr. at 84.

on the stretcher in the clips was Nethaniel because the person was wearing a watch that was noticeably similar to Nethaniel's unique watch. Tr. at 49. Seeing those reports, he believed that his brother was dead and was distraught. Statement of Facts at 13; Pl. Compl. ¶ 73. By the time that Nethaniel arrived at Tel Hashomer Hospital, some of his family members had joined Joseph and saw Nethaniel before the doctors took him back for tests.[12] Tr. at 51. The image of Nethaniel as he arrived at the emergency room was traumatic for Isaac, as Nethaniel was covered in blood and had suffered a large head wound. Isaac Depo. at 12-16. The family waited in the emergency room as Nethaniel went to get a CT scan and x-ray. Id. at 13. The Bluth family did their best "to hold each other together and be together at the hospital." Statement of Facts at 13.

It took Ephraim a couple of days to fly back to Israel due to El Al's flight schedule on Friday night and the observance of Sabbath on Saturday. Tr. at 83-84. On Sunday morning, Ephraim left New York on the first El Al flight. Id. at 90. When Ephraim arrived from New York, early Monday morning, Nethaniel was still in critical condition at Tel Hashomer Hospital. Id. at 90-91; Am. Compl. ¶ 67. The family was always with Nethaniel "to encourage

---

[12] Ephraim testified that Shoshana and the three Bluth children arrived at the hospital as the surgeon was treating Nethaniel, but it is unclear whether they saw Nethaniel before he was taken into the operating room. Tr. at 54, 89.

him, to tell him how happy [they] were that he was still part of the family." Tr. at 94.

From the moment Nethaniel arrived at the hospital, Shoshana was constantly by Nethaniel's side and constantly worried about him. Id. at 54; Statement of Facts at 14. She was with Nethaniel during his hearing test and cried with him when he realized that he could not hear anything. Tr. at 52-53. After he returned home, she let Nethaniel sleep in the bed with her and Ephraim when he needed to do so. Id. at 95. She, like Nethaniel, struggled to sleep and took sleeping pills. Statement of Facts at 14.

Ephraim cut back on traveling for work to be at home with his family more often. Tr. at 95. Ephraim testified that he felt that he had not protected Nethaniel because he was so far away and frustrated that, as a parent, he was unable to protect Nethaniel. Id. at 93. As a person who did not cry easily, Ephraim had sporadic episodes of crying and anguish as a result of the attack and its effects on Nethaniel. Id. at 96. Ephraim and Shoshana focused on helping Nethaniel try to return to a normal life and deal with his anxiety, apprehension, and fear. Id. at 94, 96.

Nethaniel's siblings came home frequently to support Nethaniel and to be with him. Statement of Facts at 10. Isaac and Arieh let Nethaniel sleep in the same room with them, which Nethaniel had not done since he was in second grade. Id.; Isaac Depo. at 21. Even years after the attack, Nethaniel's siblings

continue to be reminded of Nethaniel's fears and injuries, and live with the distress of the attack. Statement of Facts at 14; Isaac Depo. at 27-29; Tsipora Depo. at 39-40. Nethaniel's siblings are reminded of the Atzmona attack when they hear or see reports of terrorist attacks around the world. Isaac Depo. at 29; Deposition of Joseph Bluth at 22 [Dkt. No. 58-46]. Tsipora stated that she experienced breakdowns on a regular basis from listening to Nethaniel's pains and frustrations, and hearing about other victims of terrorist attacks. Tsipora Depo. at 38-39.

Nethaniel's siblings were cautious around him, especially about conversations regarding the army. Id. at 29, 31. The stress, anxiety, and severe emotional distress that resulted from the periods of time of not knowing what had happened to Nethaniel and seeing him critically injured has permanently affected all members of the Bluth family. Statement of Facts at 12. The Bluth children have stated that the attack affected the way that they raise their own children. Id. at 14. They continue to be sensitive to his emotional fluctuations and medical issues, his worries about the future, and his concentration and comprehension problems. Deposition of Yigal Amihai Bluth at 27, 29 [Dkt. No. 58-44].

**B.    Procedural History**

On February 13, 2012, Plaintiffs Nethaniel Chaim Bluth, his parents, Shoshana Rosalyn Bluth[13] and Ephraim Bluth, and his siblings Tsipora Batya Bluth Reicher, Isaac Menahem Bluth, Yigal Amihai Bluth, Arieh Yehuda Bluth, Chanina Samuel Bluth, Abraham Bluth, and Joseph Bluth timely filed a Complaint, under 23 U.S.C. § 1605A(b)(2), against the Iranian Defendants, 28 U.S.C. § 1605A; see Compl. [Dkt. No. 3]. Plaintiffs subsequently amended their original Complaint on November 7, 2012, to include two additional Defendants - the Syrian Arab Republic and the Syrian Military Intelligence ("Syrian Defendants") - following further investigation that also connected the Syrian Defendants to Hamas.[14] See Am. Compl.; Pls.' Mot. for Extension of Time for Service on Defs. at 2 [Dkt. No. 23]. Plaintiffs claim compensatory damages for pain and suffering, economic damages, solatium damages, and punitive damages resulting from the March 7, 2002 attack in Atzmona. Pl. Compl. ¶¶ 10-19.

After several unsuccessful attempts at service of process and several extensions of time by this Court, Defendants were finally

---

[13] Shoshana Bluth has since passed away and her death was noted by the Court on September 2, 2015. [Dkt. No. 46].

[14] For the purposes of evaluating Plaintiff's Motion for Default in this Judgment, the Court does not address the Syrian Defendants. See Order Severing Pls.' Claims Against Syrian Defendants & Clerk Establishing New Action for Pls.' Claims Against These Two Entities on April 29, 2015 [Dkt. No. 35].

served on May 7, 2014. Return of Service/Affidavit as to Iranian Defs. [Dkt. No. 25-1]; see infra, 29-31. Upon the Iranian Defendants' failure to appear (within sixty days) or otherwise respond to the Complaint, Plaintiffs filed the pending Motion for Default Judgment on February 23, 2015. Aff. in Support of Entry of Default of Iranian Defs. [Dkt. No. 27]; and Mot. for Entry of Default Judgment as to Liability [Dkt. No. 48]. Subsequently, pursuant to Federal Rule of Civil Procedure 55(a), the Clerk entered a default against Iranian Defendants on February 24, 2015. Clerk's Entry of Default as to the Iranian Defs. [Dkt. No. 28]; see 28 U.S.C. § 1608(d).

On January 4, 2016, this Court held an evidentiary hearing. [Dkt. No. 60]. Nethaniel and Ephraim Bluth appeared as witnesses and gave testimony. The Court and Plaintiffs had previously discussed that the expert witnesses did not need to appear and the Court could rely on their expert reports alone. Tr. at 7-8; see also Pls.' Status Report Regarding the Evidentiary Hr'g [Dkt. No. 53]. Plaintiffs' exhibits were admitted into evidence. [Dkt. No. 58]. At the Court's request, Plaintiffs submitted their proposed Statement of Facts on January 19, 2016. [Dkt. No. 59].

## II. LEGAL STANDARD

Before this Court can enter a default judgment against Iran under FSIA, plaintiffs are required to establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e); see also

Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("when the defendant State fails to appear and the plaintiff seeks a default judgment, FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court'"). The Court must scrutinize the plaintiff's allegations and "may not unquestioningly accept a complaint's unsupported allegations as true." Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 211 (D.D.C. 2012). However, an evidentiary hearing is not required; a "plaintiff may establish proof by affidavit." Id.; Weinstein, 184 F. Supp. 2d at 19.

## III. ANALYSIS

### A.   Jurisdiction Under FSIA

The Foreign Sovereign Immunities Act ("FSIA") provides the sole legal means by which a plaintiff may bring a suit against a foreign state. Reed, 845 F. Supp. 2d at 209. FSIA protects the dignity of foreign states as a matter of international law, while providing a forum for justice and legitimate grievances by providing narrow exceptions to immunity. See Murphy v. Islamic Republic of Iran, 778 F. Supp. 2d 70, 71 (D.D.C. 2011); see also 28 U.S.C. § 1602. This is consistent with Congress' intent to hold state sponsors of terrorism responsible for their crimes. Han Kim, 774 F.3d at 1049. The statute provides compensatory damages and punitive damages, if a foreign state that is or was a state sponsor

of terrorism is found to be liable. 28 U.S.C. § 1605A(c). Compensatory damages may include economic harms, solatium, and pain and suffering. Moradi, 77 F. Supp. 3d at 69. A violation may be "prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law." 28 U.S.C. § 1391(f)(4).

In 2008, Congress repealed Section 1605(a)(7) of FSIA and replaced it with Section 1605A, which broadened the jurisdiction of federal courts and created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for terrorist acts committed by the State, its agents, or employees. Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 147 (D.D.C. 2011) (internal citations omitted). FSIA "imposes tight constraints on courts required to decide whether an act satisfies the terrorism exception's substantive elements," but when the foreign state fails to appear and the plaintiff seeks a default judgment, FSIA leaves discretion to the courts to decide the standard. Han, 774 F.3d at 1046-47.

Before the court can enter a default judgment under FSIA, a plaintiff must establish his or her claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This "satisfactory to the court" standard is "identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)." Owens, 826 F. Supp. 2d at 134. Therefore,

the Court cannot "unquestioningly accept a complaint's unsupported allegations as true." Moradi, 77 F. Supp. 3d at 64 (citing Reed, 845 F. Supp. 2d at 211-12). The court determines how much and what kinds of evidence the plaintiff must provide to meet the threshold. Id. at 65. As previously mentioned, a plaintiff may establish proof by affidavit, and an evidentiary hearing is not required. See supra 26; see also Moradi, 77 F. Supp. 3d at 65; Weinstein, 184 F. Supp. 2d at 19.

A foreign state that engages in "an act of torture, an extrajudicial killing, an aircraft sabotage, a hostage taking, or provides material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency" is not immune in the federal courts of the United States. 28 U.S.C. § 1605A(a)(1). Under FSIA's "terrorism exception," a plaintiff can bring suit against a "foreign state sponsor of terrorism" when (a) there is effective service of process and personal jurisdiction, and (b) there is subject-matter jurisdiction. Reed, 845 F. Supp. 2d at 209.

### 1.   Personal Jurisdiction & Service of Process

FSIA sets forth the necessary elements of service to establish personal jurisdiction in 28 U.S.C. § 1608, and gives the methods in numerical order of preference. Worley v. Islamic Republic of

Iran, 75 F. Supp. 3d 311, 327 (D.D.C. 2014). When a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method available. Id. The first preference is for "any special arrangement[s]" for service between the plaintiff and the foreign state (i.e. a contract provision). See 28 U.S.C. § 1608(a)(1); Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo, 131 F. Supp. 2d 248, 251 (D.D.C. 2001). If no special arrangement exists, the second option is service "in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(a)(2). In this case, both of these options were unavailable because the parties do not have a special arrangement, nor is there an applicable international convention for service with Iran. See Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 52 (D.D.C. 2008). In addition, Iran does not accept service through its Ministry of Foreign Affairs in Tehran, Iran. See Worley, 75 F. Supp. 3d at 327; see generally Request for Service of Process on Def. Iran [Dkt. No. 17].

Hence, Plaintiffs served Iran pursuant to 28 U.S.C. § 1608(a)(3). Section 1608(a)(3) requires that "one copy of the summons, complaint, and notice of suit, together with a translation of each document into the language of the foreign state" be sent through any form of mail that requires a signed receipt by "the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3). A copy of

the Certificate of Mailing [Dkt. No. 11] filed on March 5, 2013, shows that the appropriate copies were sent by the clerk of this court to the head of the Ministry of Foreign Affairs of Iran. 28 U.S.C. §1608(c); see 28 U.S.C. § 1608(a)(3). Unfortunately, service of process under Section 1608(a)(3) was unsuccessful because it was not made within thirty days. See Summons Returned Unexecuted as to Iranian Defs. [Dkt. No. 12]; Aff. Requesting Foreign Mailing [Dkt. No. 14].

Thereafter, Plaintiffs proceeded to the next available method, as described in Section 1608(a)(4), a Request from Plaintiffs for Clerk to Effect Service on Iranian Defs. [Dkt. No. 16]. Plaintiffs sent two copies of the summons, complaint, and notice of suit, along with Farsi translations to the Clerk of the Court, who sent them to the Secretary of State in Washington, District of Columbia. See 28 U.S.C. § 1608(a)(4). Pursuant to the statute, the Secretary of State then transmitted one copy through the Embassy of Switzerland in Tehran, Iran and sent "a certified copy of the diplomatic note indicating when the papers were transmitted to the clerk of the court." Id.; see Certificate of Mailing [Dkt. No. 17]; Return of Service/Affidavit of Summons and Complaint Executed as to the Iranian Defs. [Dkt. No. 25-1].

In light of these filings, the Court concludes that Plaintiffs have complied with 28 U.S.C. § 1608(a)(4) and have successfully effectuated service on the Iranian Defendants.

-31-

2.  Subject Matter Jurisdiction

A court in the United States has original jurisdiction over a claim that is a (1) nonjury civil action (2) against a foreign state (3) as to the claim(s) for relief in personam, (4) provided that the foreign state is not entitled to immunity under sections 1605-1607 of FSIA or under any applicable international agreement. 28 U.S.C. § 1330(a); Worley, 75 F. Supp. 3d at 323-24. All of section 1330(a)'s requirements have been met in this case.

First, Plaintiffs have not demanded a jury trial. See Am. Compl. Second, the Iranian Defendants are considered a "foreign state" as defined by FSIA.[15] See 28 U.S.C. § 1330(a); Worley, 75 F. Supp. 3d at 324. This jurisdiction has taken a "categorical approach" to defining foreign government-related entities as a "foreign state" if the core functions of the entity are governmental. Id. (citing Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003). Third, this action is against the

---

[15] A "foreign state" is defined to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). The D.C. jurisdiction has adopted a "categorical approach" to determining the legal status of foreign government-related entities for FSIA cases and "if the core functions of the entity are governmental, it is considered the foreign state itself." Worley, 75 F. Supp. 3d at 324 (internal quotations omitted). MOIS and IRGC perform governmental functions. See supra, 5. Therefore, MOIS and IRGC may be treated as "foreign states" for the purposes of Section 1603(a) of FSIA.

Iranian Defendants as legal persons, not against property, and therefore the claims seek relief in personam. See id.

The fourth requirement looks to whether an exception to sovereign immunity exists and has several sub-requirements. The FSIA exception to foreign sovereign immunity is codified at 28 U.S.C. § 1605A. A foreign state has no sovereign immunity when "[1] money damages are sought [2] against a foreign state [3] for personal injury or death that was [4] caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A; Worley, 75 F. Supp. 3d at 324.

As to the first sub-requirement, Plaintiffs identify and seek only monetary damages for their alleged injuries. Second, as stated above, the Iranian Defendants are "foreign states" as defined by the statute. See supra 32. Third, Plaintiffs' personal injuries and all claims arise from the attack, which constitute the type of claims for personal injury required for jurisdiction. Fourth, there must be a showing of "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." Worley, 75 F. Supp. 3d at 325 (citing Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 66 (D.D.C.

-33-

2010)). Thus, a plaintiff need not show that the injury would not have occurred "but for" the defendant's actions. Id. Here, Plaintiffs have sufficiently demonstrated that Defendants have financially funded, and provided tactical support and equipment to Hamas. See supra, 5-6. Given Hamas's stated mission and purpose, financial support to Hamas is reasonably considered to be support of its mission and terrorists attacks. Consequently, the Iranian Defendants have assisted Hamas in carrying out the Atzmona attack. The facts demonstrate the kind of reasonable connection required under section 1605A.

Fifth, Plaintiffs must show that Iran provided "material support or resources" "knowing or intending that they are to be used in preparation for, or in carrying out," a violation of the various enumerated sections. 18 U.S.C. § 2339A(a). Broadly defined, "material support or resources" includes "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, and transportation, except medicine or religious materials." Torture Victim Protection Act of 1991 ("TVPA"), 18 U.S.C. § 2339A. The facts found by this Court demonstrate that Iran has provided Hamas

with financial support as well as tactical training and planning support. See supra, 6.

For these reasons, the Court finds that an exception to sovereign immunity exists because this case satisfies each element of section 1605A(a)(1). In addition, all of section 1330(a)'s requirements are satisfied and the Court has original jurisdiction to hear Plaintiffs' claims.

In order for a claim to be heard, Section 1605A imposes three additional requirements that must be met: (1) the foreign state was designated a state sponsor of terrorism at the time of the act; (2) the claimant or victim was a national of the United States; and (3) in cases where the act occurred in the foreign state against whom suit has been brought, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration. 28 U.S.C. § 1605A(a)(2).

First, Iran has been designated as a state sponsor of terrorism since 1984 and remained designated as such at the time of the act. See supra, 5; Moradi, 77 F. Supp. 3d at 65. At all times relevant to this action, Iran has been a state sponsor of terrorism. Id. (citing Dr. Levitt and Dr. Clawson's affidavits). Second, Plaintiffs are all United States citizens. Pls.' Exs. 33-42 [Dkt. No. 57-33, to -42]. Lastly, Plaintiffs were not required by statute to afford Defendants a reasonable opportunity to

arbitrate because the act at issue did not occur in the defendant state. 28 U.S.C. § 1605A(a)(2); see Worley, 75 F. Supp. 3d at 327.

### B.    Liability Under § 1605A

Having found that Plaintiffs have a private right of action under § 1605A(c), having determined that the Iranian Defendants are a "state sponsor of terrorism" who provided "material support or resources" to Hamas, and having found that Hamas was responsible for the March 7, 2002 attack in Atzmona, supra 5, Iran is liable under § 1605A(c) for any personal injuries caused by Hamas's attack.

To find liability, the Court must first identify the relevant law. Worley, 75 F. Supp. 3d at 335 (internal citations omitted). "Based on the D.C. Circuit's guidance, district courts in this jurisdiction 'rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions' to define the elements and scope of these theories of recovery." Id. (citing Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)).

### 1.    Nethaniel's Claims

Nethaniel brings claims for battery and intentional infliction of emotional distress ("IIED"), and his family members bring a claim for solatium. The Iranian Defendants are liable for battery if, when they provided material support and resources to

Hamas, they acted "intending to cause a harmful or offensive contact with, or an imminent apprehension of such a contact by, those attacked and a harmful contact with those attacked directly or indirectly resulted." Valore, 700 F. Supp. 2d at 76-77 (internal quotations omitted) (citing Restatement (Second) of Torts § 13). "Harmful contact" includes "any physical impairment of the condition of another's body, or physical pain or illness." Id.

As set forth in detail above, Nethaniel has met his burden and has clearly established the necessary elements of battery. Defendants "acted with intent to cause harmful contact and the immediate apprehension thereof" because "acts of terrorism are, by their very nature intended to harm and to terrify by instilling fear of such harm." See id. The affidavits of the various experts have proven that the Iranian Defendants gave financial, tactical, and other support to Hamas during the relevant time period. Consequently, the Court can infer that Iran knew it was supporting and encouraging terrorist attacks which could include a Hamas member attacking the Atzmona yeshiva with the intent to cause injuries and fatalities. See supra, 10-11. There is no question that Nethaniel has also shown that such "harmful contact" did in fact occur. See supra, 13-19.

Nethaniel's second claim is for IIED. "An act that would otherwise constitute IIED gives rise to liability under the FSIA." Reed, 845 F. Supp. 2d at 212. Under District of Columbia law, the

elements of a cause of action for IIED are "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." Ben-Rafael, 540 F. Supp. 2d at 56; see also Worley, 75 F. Supp. 3d at 336 (citing Restatement (Second) of Torts § 46(2)(a)).

All three elements of IIED are satisfied. First, acts of terrorism are per se extreme and outrageous conduct. Ben-Rafael, 540 F. Supp. 2d at 56 (internal citations omitted). Second, the attack on the yeshiva was intended to cause emotional distress. See id. (stating that intent or recklessness can be inferred from the outrageousness of the act). Lastly, Nethaniel has shown that he experienced severe emotional distress because of the terrorist attack. Moreover, he still suffers from flashbacks, nightmares, and fears and anxieties that resulted from the Atzmona attack. See supra, 16-19.

### 2.   Claims of Nethaniel's Parents and Siblings

Nethaniel's parents and siblings allege one count of solatium against the Iranian Defendants. "Solatium claims under the FSIA are functionally identical to claims for intentional infliction of emotional distress." Moradi, 77 F. Supp. 3d 71-72 (internal citations omitted). Such damages are intended for "mental anguish, bereavement and grief that those with a close personal relationship to the decedent experience as well as the harm caused by the loss

of the decedent's society and comfort." Id. at 72 (internal quotations omitted). Solatium damages are also available to compensate those related to persons injured, rather than killed, in a terrorist attack. Id. (citing Spencer v. Islamic Republic of Iran, 71 F. Supp. 3d 23, 27 (D.D.C. 2014)). Courts may presume "spouses and those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." Id. "As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain claims for solatium." Id.

The record presented establishes that the March 7, 2002 Atzmona attack and Nethaniel's resulting injuries caused and continue to cause Nethaniel's parents and siblings significant mental anguish and emotional distress. See supra, 19-25. Ephraim reduced his work travel because he felt that he had not protected Nethaniel; he also experienced sporadic episodes of crying, which did not start until after the attack. See supra, 23-24. Shoshana experienced a great deal of anguish and anxiety on the night of the attack and because of not knowing what had happened to her son. After the attack, Shoshana cried with Nethaniel when he realized that he could not hear anything at all during his hearing test, and she later helped him with daily activities. See supra, 15-16. She relied on sleeping pills and constantly worried about and stayed near Nethaniel.

Nethaniel's siblings were also affected. They came home more frequently and helped him with daily activities. See supra, 16-17. His siblings produced sworn depositions[16] that were subsequently admitted into evidence and which show that their relationship with Nethaniel was greatly affected in the kinds of conversations and activities they could do together. See supra, 24. The Court is satisfied that the Bluth family's emotional distress was clearly brought on as a result of the terrorist attack. Nethaniel's parents and all of Nethaniel's siblings except Chanina Bluth are entitled to solatium damages.[17] See Spencer, 71 F. Supp. 3d at 27. Chanina has not given any testimony, nor did any testimony speak directly to his harms, and therefore there can be no finding of liability with regard to him.

---

[16] All of the Bluth children, except Chanina Bluth, submitted sworn depositions and each was admitted into evidence. See Bluth Depositions [Dkt. Nos. 58-44, -45, -46, -47, -48, -49].

[17] Shoshana Bluth passed away on August 6, 2015. Our Court of Appeals has ruled that the Court may, sua sponte, substitute an appropriate person, such as a close relative, as a representative of her estate, Mohammadi v. Islamic Republic of Iran, 947 F. Supp. 2d 48, 55 (D.D.C. 2013), aff'd, 782 F.3d 9 (D.C. Cir. 2015). In addition, Fed. R. Civ. P. 25(a)(1) provides that "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party." Finally, there is more than adequate evidence describing the close relationship between Shoshana Bluth and her injured son, and the extent of her anxiety and grief at the time of his injury and during the rest of his life.

C.    **Damages Under § 1605A**

1.    Compensatory Damages

Plaintiffs seek compensatory damages for pain and suffering, economic harms, and solatium, as well as punitive damages. Am. Compl. ¶¶ 77-84. FSIA allows plaintiffs to recover "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "Accordingly, those who survived the attack may recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." Oveissi, 879 F. Supp. 2d at 55. To obtain compensatory damages, Plaintiff must "prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate." See, Reed, 845 F. Supp. 2d at 213; Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 134 (D.D.C. 2005).

a.    Pain and Suffering

Nethaniel seeks damages against Defendants of $10 million on one count of battery and $10 million on one count of IIED. Am. Compl. ¶¶ 79, 81.

To determine pain and suffering awards for injured victims under FSIA, the Court must consider factors including "the severity of the pain immediately following the injury, the length of

hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." Owens, 71 F. Supp. 3d at 259 (internal citations omitted). A plaintiff who has alleged multiple claims is limited to recover from the tortfeasor under only one of the theories, although the tortfeasor may be liable under more than one. Valore, 700 F. Supp. 2d at 77 (stating that the plaintiffs who had claimed assault, battery, and IIED could recover under only one of any such theories) (citing Beer v. Islamic Republic of Iran, 574 F. Supp. 2d 1, 13 (D.D.C. 2008)).

### i.   Count 1 - Battery

Nethaniel claims relief for his "great pain and suffering;" for extensive and continuing medical treatment; for expenses including hospitalization, physician's services, nursing care, and rehabilitation treatment; and for diminished earning capacity - all resulting from the Atzmona attack. Am. Compl. ¶ 78.

The evidentiary hearing and depositions establish that the pain and suffering Nethaniel experienced during and since the attack was a reasonably certain consequence of Defendant's acts. The attacker, Farahat, fired shots and threw grenades into Nethaniel's classroom. As a result, Nethaniel was severely injured by a grenade explosion, requiring a number of surgeries as a result of the attack. He was subsequently hospitalized for over a week and was required to return to the hospital for outpatient rehabilitation. Over a decade later, Nethaniel continues to suffer

physically, including permanent hearing loss in one ear, tinnitus, and pain from the shrapnel still in his body. He continues to experience increased stress and anxiety, paranoia, nightmares, and extreme emotional fluctuations. See supra, 13-19. Thus, Nethaniel is entitled to pain and suffering damages for his injuries, hospitalization, rehabilitation, and continuing physical and psychological pain. See Moradi, 77 F. Supp. 3d at 69-70.

The Court now turns to the question of what amount of damages for pain and suffering is appropriate. It is clear that "putting a number on these kinds of harms can be difficult." Price, 384 F. Supp. 2d at 134.

This jurisdiction has developed a general framework for assessing pain and suffering awards for victims of terrorist attacks. "Plaintiffs who suffer serious physical injuries tend to receive a $5 million award; plaintiffs who suffer relatively more serious or numerous injuries may receive $7 million (or more); and plaintiffs whose injuries are relatively less serious or who only suffer emotional injuries may receive something closer to $1.5 million." Owens, 71 F. Supp. 3d at 259; see also Valore, 700 F. Supp. 2d at 84-85; O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 46-47 (D.D.C. 2012).

In a case where a plaintiff suffers from physical injuries such as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as lasting and severe psychological

pain, this Court has awarded a baseline of $5 million dollars. Valore, 700 F. Supp. 2d at 84 (citing Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 54 (D.D.C. 2007). Nethaniel suffered serious head and hand injuries, some of which required stitches and plastic surgery. The right side of his face and head was cut so deeply that the bone was visible. See supra, 14. Nethaniel's severe flesh wounds have left scars and his wounds from the shrapnel continue to affect him. For some time following the attack, Nethaniel experienced severe paranoia, anxiety, a speech impediment, and fear of loud noises and the dark. Most significantly of all, he has lost all hearing in one of his ears— a condition which can never change. See supra, 15-16. Finally, he continues to suffer from lasting psychological and emotional pain. See supra, 17-18. Accordingly, and because of the loss of hearing in one ear, the Court will award Plaintiff $6 million on his count of battery against the Iranian Defendants. See Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 52 n. 26 (D.D.C. 2007); Valore, 700 F. Supp. 2d at 84.

### ii.  Count II - IIED

Nethaniel claims relief for "extreme mental anguish and pain and suffering" resulting from the loss of his friends, intense physical injury, pain, discomfort, and inconvenience in his IIED count, Am. Compl. ¶ 81.  The Court has found Defendants liable on this count, see supra, 36-38.

However, because Nethaniel has made a claim for battery, seeking similar damages for pain and suffering under that count, see supra, 38-39, it would constitute impermissible double recovery to allow him to recover for pain and suffering under both counts. See Valore, 700 F. Supp. 2d at 77. This jurisdiction has found that a plaintiff who claims multiple theories is limited to recover under only one. See supra, 39. Accordingly, the Court cannot award Nethaniel damages for pain and suffering on the count of IIED against the Iranian Defendants.

b.   Economic Damages

Under FSIA, injured victims may recover economic damages, which typically include lost wages (both past and future), benefits and retirement pay, and other out-of-pocket expenses. Owens, 71 F. Supp. 3d at 258. The plaintiff must "prove the amount of damages by a reasonable estimate." Reed, 845 F. Supp. 2d at 213. Unlike damages awarded for pain and suffering, "lost earnings are not hard to quantify and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence." Moradi, 77 F. Supp. 3d at 71.

As in Moradi, where the court concluded that the evidence was insufficient to support any award of economic damages because the plaintiff's declaration was the only evidence supporting his claim for lost earnings, Nethaniel has also failed to show the requisite evidentiary support to estimate his lost income. See Moradi, 77 F.

-45-

Supp. 3d at 71. Nethaniel's testimony neither shows an estimate of his lost past and future income, nor does it include any specificity on what kind of job he wanted prior to the attack other than completing his mandatory military service. See id. Therefore, there is not sufficient evidence for the Court to award economic damages.

c.   Solatium Damages

Shoshana, Ephraim, Tsipora, Chanina, Arieh, Yigal, Isaac, Abraham, and Joseph Bluth claim solatium damages resulting from injuries to Nethaniel. Am. Compl. ¶¶ 82-84. They each, jointly and/or severally, claim $10 million for severe emotional distress, extraordinary grief, and mental anguish. Id. ¶ 84.

As with damages for pain and suffering, solatium damages are difficult to quantify. Moradi, 77 F. Supp. 3d at 72. This jurisdiction has held that "where the victim does not die, but instead only suffers injury, the solatium awards (based on the framework set forth in Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006) are halved: each parent receives $2.5 million and each sibling receives $1.25 million." Id. (citing Owens, 71 F. Supp. 3d at 260; Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 52 (D.D.C. 2007); see also Reed, 845 F. Supp. 2d at 214). Accordingly, Ephraim and Shoshana will each receive $2.5 million; and each of the Bluth siblings, except Chanina, will receive $1.25 million.

-46-

### 2.  Punitive Damages

Plaintiffs seek $500 million in punitive damages. Am. Compl. ¶ 86. "Punitive damages is not an independent cause of action." Worley, 75 F. Supp. 3d at 337 (internal citations omitted). Such damages are "awarded to punish a defendant for particularly egregious conduct, and to serve as a deterrent to future conduct of the same type." Weinstein, 184 F. Supp. 2d at 23-24. The language of FSIA specifically "provides courts with the power to award punitive damages against an agency or instrumentality of a foreign state in a case" brought pursuant to 28 U.S.C. § 1605A. See Weinstein, 184 F. Supp. 2d at 24. Therefore, the Court has the power to award punitive damages to Plaintiffs on their section 1605A claims.

To calculate the proper punitive damages award, the Court considers "four factors: (1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause; (3) the need for deterrence; and (4) the wealth of the defendants." Moradi, 77 F. Supp. 3d at 73; Weinstein, 184 F. Supp. 2d at 24 (citing Restatement (Second) Torts § 908).

First, the character of the Iranian Defendants' attack is clearly most heinous. See, e.g., Oveissi, 879 F. Supp. 2d at 56; see also Weinstein, 184 F. Supp. 2d at 25. "The defendants' demonstrated policy of encouraging, supporting and directing a

-47-

campaign of deadly terrorism is evidence of the monstrous character of the [attack] that inflicted maximum pain and suffering on innocent people." Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 278 (D.D.C. 2003). Second, the Court has already found that Nethaniel has satisfactorily proven the severe extent of his injuries, which was intended by Defendants. Third, punitive damages would serve as a deterrence because Defendants have a history and "demonstrated policy" of supporting terrorist activities. See Valore, 700 F. Supp. 2d at 88. Fourth, Iran is a sovereign and has substantial wealth. See Weinstein, 184 F. Supp. 2d at 25; see also Oveissi, 879 F. Supp. 2d at 56.

In Moradi, after finding that "societal interests in punishment and deterrence warrant imposition of punitive sanctions," the Court decided to award punitive damages in an amount equal to the total compensatory damages awarded. See Moradi, 77 F. Supp. 3d at 73; see also Onsongo v. Republic of Sudan, 60 F. Supp. 3d 144, 152-153 (D.D.C. 2014).

Alternatively, the courts in Weinstein and Valore have chosen to base the punitive damages based on Iran's funding of MOIS. In Weinstein, the court found that $150 million was an appropriate award in punitive damages. 184 F. Supp. 2d at 25-26. The court was satisfied with that amount, even though several plaintiffs were seeking punitive damages from one defendant and there was a potential of depleting the defendant's limited fund. Id.

In _Valore_, the court found, based on expert testimony, that an award of punitive damages would serve to deter Iran from supporting terrorist activities. 700 F. Supp. 2d at 88. The expert testified that any amount of punitive damages based on a multiplier between three and ten of the known amount of Iran's annual cash assistance to the specific terrorist group would affect the conduct of Iran. _Id._ at 88-89. Consequently, the _Valore_ court accepted the multiplier of five and awarded $1 billion in punitive damages for the hundreds of military people who died or were injured and their families. See _id._ at 60-61, 89-90.

As in _Weinstein_ and _Valore_, the Defendants in this case did not directly carry out the attack, but funded Hamas, which then carried it out. That fact is far from the detention and torture that was directly carried out by the defendants in _Moradi_. While Defendants' acts are closer to those committed in _Weinstein_ and _Valore_, it is doubtful whether a large amount resulting from an expenditure-times-multiplier method would have the deterrent effect that it might have had in times past. Given the frequency of these attacks and the lack of any evidence that high awards have successfully deterred them, the Court finds that neither the large sum of $500 million requested by Plaintiffs nor the sum resulting from the expenditure-times-multiplier method is appropriate.

In view of the fact that it was Hamas, not Defendants, who actually committed the terrorist action, that Nethaniel has suffered life-time injuries that were intended by Defendants, and that his family members were deeply affected by his physical, emotional, and psychological harms, the Court concludes that $25 million in punitive damages is appropriate.

## IV.  CONCLUSION

For the reasons stated above, the Court will grant Plaintiffs' motion for default judgment and enter judgment for Plaintiffs in the amounts specified above. A separate Default Judgment accompanies this Memorandum Opinion.


August 25, 2016                    Gladys Kessler
                                   United States District Judge


**Copies to**: attorneys on record via ECF